UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN V. BURKE,
  Plaintiff,

          v.                          CIVIL ACTION NO.
                                      09-11514-JLT
MICHAEL J. ASTRUE, Commissioner of
the Social Security Administration
of the United States of America,
  Defendant.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION FOR ORDER AFFIRMING**
**THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 19)**

**August 6, 2010**

**BOWLER, U.S.M.J.**

Pending before this court is a motion by defendant Michael

J. Astrue, Commissioner of the Social Security Administration

("the Commissioner"), seeking an order affirming the denial of

benefits to John V. Burke ("plaintiff").  (Docket Entry # 19).

PROCEDURAL HISTORY

Plaintiff applied for Social Security Disability Insurance

("SSDI") on December 18, 2007, and additionally applied for

Supplemental Security Income ("SSI") on December 31, 2007.

(Docket Entry # 18).  Both claims were initially denied on

January 4, 2008, by the Social Security Administration ("SSA").

(Docket Entry # 18).  After reconsideration, both claims were

denied again on July 23, 2008.  (Docket Entry # 18).  On August

15, 2008, plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ") and the request was granted. (Docket Entry # 18).

On February 26, 2009, plaintiff appeared and testified before the ALJ. (Docket Entry # 18). The ALJ issued a decision denying plaintiff's application for benefits on April 9, 2009. (Docket Entry # 18). The Decision Review Board ("DRB") then selected the ALJ's decision for review. When the board did not complete its review in the allotted 90 day period, the ALJ's decision became the final decision of SSA on July 19, 2009. (Tr. 1). On September 11, 2009, plaintiff filed this action against the Commissioner pursuant to 42 U.S.C. § 405(g). (Tr. 1).

## FACTUAL BACKGROUND

Plaintiff is a college educated male who is currently 51 years old. (Tr. 20). In 1991, plaintiff was involved in a serious automobile accident which caused him to undergo significant plastic surgery. (Tr. 25-26). As a part of that surgery, plaintiff's face required reconstruction using metal supports. (Tr. 25-26). Plaintiff alleges that he suffered from nightmares for a three to four year period following the accident but after that period the nightmares subsided. (Tr. 200). In the 13 years following plaintiff's accident he worked as both a

2

janitor and a security guard.  (Tr. 21-23).  He worked as a
janitor for approximately ten years, roughly 1993 to 2003, and
then worked as a security guard for approximately one year,
roughly 2003 to 2004.  (Tr. 21-23).

In 2004, plaintiff quit his job over a disagreement with his
boss.  (Tr. 31).  He asserts that his boss "freaked out" when he
asked for time off to find a new place to live and that the
ensuing argument ended with plaintiff throwing his keys at his
supervisor and walking out.  (Tr. 31).  He asserts that his
nightmares began to recur a few months prior to this incident,
that they worsened after the incident and that he has suffered
from such nightmares ever since.[1]  (Tr. 32).  Plaintiff has not
worked since quitting his job in 2004.  (Tr. 21).

On December 11, 2007, plaintiff admitted himself to Whidden
Memorial Hospital ("Whidden") reporting deep depression and
suicidal ideations.  (Tr. 203).  He reported that he was
chronically sleep deprived and had begun feeling depressed in the
weeks immediately preceding his admittance.  (Tr. 203).  He also
reported that he had difficulty achieving pleasure, had low
energy levels and had experienced a decline in his activity
level, self esteem and ability to concentrate.  (Tr. 203).  He

---

[1] Although plaintiff alleges that his nightmares began to
recur in 2004, he admits that, except one time immediately
following his car accident, he never consulted a physician for
his symptoms prior to his hospitalization in 2007.  (Tr. 30).

was administered low dose antipsychotic medication at bedtime to help relieve his nightmares and after three days he felt considerably better.  (Tr. 200).  He was discharged upon his own request on December 14, 2007, in improved condition.  (Tr. 201).  After his stay at Whidden, plaintiff regularly utilized outpatient counseling services through North Suffolk Mental Health Association ("North Suffolk").  (Tr. 29-30).  Plaintiff visited the counseling center a few times a month and consulted with various doctors there.  (Tr. 29-30).

On March 20, 2008, plaintiff had a consultative visit with Harry Senger, M.D. ("Dr. Senger"), a doctor from the Massachusetts Rehabilitation Commission's Disability Determination Services.  (Tr. 244).  Dr. Senger diagnosed plaintiff with "Major Depressive Disorder, Residual Type, With Prominent Insomnia" and "Schizoid Personality Disorder."  (Tr. 246).  Aside from the nightmares, plaintiff showed no signs of post traumatic stress disorder ("PTSD").  (Tr. 246-47).  In spite of his prominent insomnia, plaintiff reported that he had "fair energy during the day."  (Tr. 246).  Plaintiff answered questions appropriately, rationally, with good eye contact, in a strong voice and did not appear prominently depressed.  (Tr. 246).  From an intellectual standpoint, plaintiff was able to score perfectly

- 30 out of 30 - on a Mini Mental Status Exam[2] administered by
Dr. Senger and complete a Serial Sevens[3] task rapidly, without
error.  (Tr. 246).  Plaintiff reported basic self care, weekly
visits with friends and the ability to travel on public
transportation as well as drive a car.  (Tr. 247).  Dr. Senger
opined that at least in the confines of his office, plaintiff "is
able to comprehend, remember and carry out basic instructions"
and that plaintiff "is not psychotic, does not show significant
cognitive impairment and is competent to manage funds."  (Tr.
247).

    Also in March of 2008, plaintiff was evaluated by a Edwin
Davidson, M.D. ("Dr. Davidson").  (Tr. 249).  Dr. Davidson rated
plaintiff's functional limitations and determined that plaintiff
had a mild restriction of activities of daily living, a moderate
difficulty in maintaining social functioning, a mild difficulty

---

[2]  A Mini Mental Status Exam is:

    a brief psychological test designed to differentiate among
    dementia, psychosis and affective disorders.  It may include
    ability to count backward by 7s from 100, to identify common
    objects such as a pencil and a watch, to write a sentence,
    to spell simple words backwards, and to demonstrate
    orientation by identifying the day, month, and year as well
    as town and country.

Http://medical-dictionary.thefreedictionary.com (citing Mosby's
Medical Dictionary (8th ed. 2009)).
    [3] "Serial Sevens, counting down from one hundred by sevens,
is a clinical test used to test mental function."
Http://medical-dictionary.thefreedictionary.com.

in maintaining concentration, persistence or pace and one or two episodes of decompensation, each of extended duration.  (Tr. 259).  Dr. Davidson also conducted a Residual Functional Capacity ("RFC")[4] assessment of plaintiff.  (Tr. 263).  He determined that plaintiff had no cognitive impairment with respect to understanding and memory and had no impairment with respect to sustained concentration and persistence.  (Tr. 265).  Dr. Davidson also determined that with respect to social interaction, plaintiff "would have difficulty dealing with the public and with critical supervision, but could otherwise function in an unpressured setting."  (Tr. 265).  Dr. Davidson opined with respect to adaptation that plaintiff would "do best in a consistent setting."  (Tr. 265).

From April through July of 2008, plaintiff made six documented visits to the East Boston Counseling Center (4/4/08, 4/11/08, 4/18/08, 5/2/08, 7/11/08 and 7/25/08).  (Tr. 366-70).  He consistently complained of nightmares and insomnia but only seemed to suffer from depression and anhedonia[5] some of the time.  (Tr. 366-70).  On April 4, 2008, plaintiff's behavior was "within normal limits."  (Tr. 366).  On May 2, 2008, plaintiff seemed

---

[4]  "RFC is a multidimensional description of the work related abilities you retain in spite of your medical impairments."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

[5]  Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's Medical Dictionary 88 (27th ed. 2000).

"tired from [lack of] sleep" but, overall, appeared "logical" and "euthymic."[6]  (Tr. 368).  On July 11, 2008, plaintiff was on "a little high" as his son was home and he had just won $3,800 on horse racing at the Belmont Stakes and on July 25, 2008, he seemed "mildly anxious" and had somewhat diminished desire but stated that he felt "pretty good all-in-all."  (Tr. 370).  All six assessments were documented by Michael Thorman, M.S. ("Thorman"), a clinician at the counseling center who plaintiff describes as his "social worker."  (Tr. 30).

On July 10, 2008, plaintiff was evaluated by Stephen Spangler, M.D. ("Dr. Spangler").  (Tr. 308).  Dr. Spangler diagnosed plaintiff with a depressive disorder and potentially a personality disorder.  (Tr. 308).  Dr. Spangler ultimately determined, in his rating of plaintiff's functional limitations, that plaintiff had a mild limitation in "activities of daily living," a mild limitation in "maintaining concentration, persistence or pace," a moderate limitation in "maintaining social functioning" and has had one or two "extended episodes of decompensation."  (Tr. 318).  Dr. Spangler also conducted an RFC assessment of plaintiff.  (Tr. 304).  He concluded that with respect to understanding and memory, plaintiff has no limitations

---

[6] Euthymic is a form of the word "euthymia" which, as used here, means "[m]oderation of mood, not manic or depressed." Stedman's Medical Dictionary 627 (27th ed. 2000).

and with respect to sustained concentration and persistence, plaintiff is "able to focus and persist at simple tasks for 2 hrs. in an 8 hr. day." (Tr. 306). Dr. Spangler also concluded that with respect to social interaction, plaintiff "relates adequately in simple social situations" and with respect to adaptation plaintiff has no limitations. (Tr. 306).

Plaintiff consulted with Thorman twice more in August of 2008 and continued to exhibit symptoms of depression and insomnia. (Tr. 371). On September 22, 2008, plaintiff consulted with a Kathleen Nelson, M.D. ("Dr. Nelson") of North Suffolk. (Tr. 384). Dr. Nelson concluded that plaintiff likely suffers from sleep apnea and also shows symptoms of PTSD and depression. (Tr. 384). At the time of the visit, Dr. Nelson evaluated plaintiff as having appropriate behavior, clear speech, logical thought processes and euthymic mood. (Tr. 384).

From September 2008 to February 2009, there is no evidence in the record regarding plaintiff's health or status. On February 3, 2009, Thorman, along with an A. Hanson, M.D.,[7] also from North Suffolk, sent a letter with an RFC assessment attached to the SSA conveying their opinions of plaintiff's condition.[8] (Tr. 339). The letter asserts that plaintiff is diagnosed with

---

[7]   Dr. Hanson's full name is not provided in the record.
[8]   According to plaintiff's testimony, he has consulted with Dr. Hanson on two occasions, however, there was no record of either consultation provided to the ALJ. (Tr. 29).

8

"recurrent major depression as well as post traumatic stress disorder, the most disabling features of these co-occurring conditions are sleep deprivation, withdrawal and avoidance, anhedonia, lack of energy, and nightmare disorder."  (Tr. 339). The letter states that plaintiff's symptoms "have persisted now in varying degrees for nearly 3 years, becoming most acute in the last 10-12 months."  (Tr. 339).  Additionally, the letter notes that plaintiff's symptoms are "severe and disabling, significantly impairing his occupational and social functioning." (Tr. 339).  The RFC assessment that is provided by Dr. Hanson, however, lacks the narrative conclusion called for in section three of the report.  (Tr. 342).

## DISCUSSION

A.  JURISDICTION AND STANDARD OF REVIEW

     This court has the power to enter upon the pleadings and the record, a judgment affirming, modifying or reversing the decision of the Commissioner with or without remanding the case for rehearing.  See 42 U.S.C. § 405(g).  This court's review is limited to whether the ALJ's decision conformed to statutory requirements and whether substantial evidence supports the result.  See Geoffrey v. Secretary of Health and Human Services, 663 F.2d 315, 319 (1st Cir. 1981).  "The resolution of conflicts

in the evidence and the ultimate determination of disability are
for the ALJ, not the courts." <u>Sanchez v. Barnhart</u>, 230 F.Supp.2d
250, 252 (D.P.R. 2002); <u>see</u> <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9
(1st Cir. 2001); <u>Manso-Pizarro v. Secretary of Health and Human
Services</u>, 76 F.3d 15, 16 (1st Cir. 1996); <u>Rodriguez v. Secretary
of Health and Human Services</u>, 647 F.2d 218, 222 (1st Cir. 1981).
A reviewing court may not re-weigh the evidence or substitute its
own judgment for that of the ALJ.  <u>See</u> <u>Ortiz v. Secretary of
Health and Human Services</u>, 955 F.2d 765, 769 (1st Cir. 1991).

Ultimately, this court "must affirm the Secretary's
resolution, even if the record could justify a different
conclusion, so long as it is supported by substantial evidence."
<u>Rodriguez Pagan v. Secretary of Health and Human Services</u>, 819
F.2d 1, 3 (1st Cir. 1987) (citing <u>Lizotte v. Secretary of Health
and Human Services</u>, 654 F.2d 127, 128 (1st Cir. 1981)).
"Substantial evidence is more than a scintilla of evidence that a
reasonable person could find sufficient to support the result."
<u>Musto v. Halter</u>, 135 F.Supp.2d 220, 225 (D.Mass. 2001).
"Substantial evidence exists when a reasonable mind, reviewing
evidence in the record as a whole, could accept it as adequate to
support the Commissioner's conclusion."  <u>Id.</u> at 225 (citing
<u>Rodriguez</u>, 647 F.2d at 222).  The ALJ's findings of fact are
conclusive if supported by substantial evidence.  <u>See</u> <u>Richardson</u>

<u>v. Perales</u>, 402 U.S. 389, 390 (1971); <u>Seavey v. Barnhart</u>, 276

F.3d at 9; <u>Manzo-Pizarro v. Secretary of Health and Human</u>

<u>Services</u>, 76 F.3d at 16.

B.   <u>DISABILITY DETERMINATION</u>

In order to find that a plaintiff may receive disability

benefits, it must be determined by the ALJ that plaintiff is

disabled under the meaning of 42 U.S.C. § 423(d) ("Section

423(d)").  Section 423(d) defines disability as the:

> Inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

The Social Security Act and its regulations, 20 C.F.R. §§

404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v), establish a five

step analysis to determine whether a claimant is disabled within

the meaning of section 423(d).  See <u>Millis v. Apfel</u>, 244 F.3d 1

(1st Cir. 2001) (citing <u>Goodermote v. Secretary of Health and</u>

<u>Human Services</u>, 690 F.2d 5, 6-7 (1st Cir. 1982)).

Under the first step, a claimant is automatically considered

not disabled if he is currently employed.  See <u>Goodermote</u>, 690

F.2d at 6.  If the claimant is not employed, however, he

satisfies step one and the decision maker must move on to step

two.  See <u>Id.</u>  Under step two, the decision maker must determine

11

whether the claimant has a severe impairment.  <u>See</u> <u>Id.</u>  A severe impairment is one that meets a 12 month durational requirement, <u>see</u> 20 C.F.R. § 404.1509, and "significantly limits your physical ability to do basic work activities."[9]  If the claimant does not have a severe impairment, he is not considered disabled.  <u>See</u> <u>Goodermote</u>, 690 F.2d at 6.  If the claimant is found to have a severe impairment, the decision maker moves to step three.  <u>See</u> <u>Id.</u>

Under the third step, the decision maker determines whether the claimant either has an impairment listed in appendix 1, subpart P, part 404 of the Code of Federal Regulations, or an impairment equivalent to one of the impairments listed.  <u>See</u> 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has a listed impairment or the equivalent, the claimant is considered disabled.  <u>See</u> <u>Goodermote</u>, 690 F.2d at 6.  If the claimant does not have a listed impairment or its equivalent, the decision maker moves to the fourth step.  <u>Id.</u>

---

[9]  Basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

At step four, the decision maker must determine whether the claimant has the residual functional capacity (RFC) to perform his past work.  See 20 C.F.R. § 404.1520(e).  Past relevant work consists of any work the claimant has performed within the last 15 years.  See 20 C.F.R. § 404.1560(b)(1).  If claimant is able to perform any past relevant work, claimant is considered not disabled.  See Goodermote, 690 F.2d at 7.  If the claimant is unable to do any past relevant work, the decision maker must then proceed to step five.  See Id.

Under the fifth step, the decision maker must determine, based on the claimant's RFC, age, education, and work experience, whether the claimant can perform another job that exists in the national economy.[10]  See 20 C.F.R. § 404.1520(a)(4)(v).  If claimant can perform another job that exists within the national economy, claimant is considered not disabled.  See Id.

This court now analyzes the ALJ's determination under the foregoing sequential analysis.  According to the evidence before the ALJ, plaintiff had not engaged in any substantial gainful activity since September 1, 2004.  (Tr. 9).  Accordingly, there was substantial evidence for the ALJ to proceed to step two.  At

---

[10]   "[W]ork exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.  It does not matter whether-- 1) Work exists in the immediate area in which you live; 2) A specific job vacancy exists for you; or 3) You would be hired if you applied for work."  20 C.F.R. § 404.1566.

the second step, the ALJ determined that plaintiff "has the following severe impairments:  depression and post traumatic stress disorder."  (Tr. 9).  That determination is supported by substantial evidence based on the opinions of Dr. Senger, Dr. Davidson, Dr. Spangler and Dr. Nelson.  (Tr. 242, 252, 254, 311, & 384).  Thus, the ALJ properly proceeded to step three.

At step three, the ALJ determined that plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."  (Tr. 12).  Plaintiff contends, however, that the ALJ erred in making this determination because the ALJ "relied heavily" (Docket Entry # 18) on Dr. Senger's March 2008 examination.  Plaintiff states that:

> [w]hile Dr. Senger's findings may have been accurate at the time of the exam, at the time of the hearing, his opinion was almost a year old, and the Plaintiff had been under the care of doctors whose opinions differed significantly from Dr. Senger based on their ongoing observations of the Plaintiff while under their care.

(Docket Entry # 18).  Plaintiff further contends that the ALJ's finding "is not supported by the totality of the evidence available to the Judge to consider" and that "at the time of the hearing, the most recent medical evidence supported three 'marked' limitations pursuant to paragraph B."  (Docket Entry # 18).

14

In order for a claimant to have an affective disorder under step three, the claimant must satisfy either paragraphs A and B or paragraph C of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Paragraph A calls for "[d]emonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following . . .." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A). Paragraph A then lists seven conditions, including "[p]erceptual or thinking disturbances," "[c]hange in personality" and "[d]isturbance in mood." Id. The ALJ determined, and plaintiff does not contest, that plaintiff suffers from impairments sufficient to meet the criteria in paragraph A.

Paragraph C calls for a medically documented history of a chronic affective disorder of at least two years duration. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). Since plaintiff's medical record began slightly over one year prior to his hearing, the ALJ could not possibly have found the plaintiff met the two year requirement of C. Accordingly, the ALJ determined, and plaintiff does not contest, that plaintiff does not meet the criteria set forth in paragraph C. Substantial evidence supports the ALJ's findings relative to paragraphs A and C.

Plaintiff, however, disputes the ALJ's determination that he does not meet the criteria in paragraph B.  (Docket Entry # 18). Paragraph B states that the conditions described in paragraph A must result in at least two of the following:

> 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).  In order to satisfy the paragraph B part of step three, the ALJ must determine that a claimant possesses a "marked limitation" in at least two of the four paragraph B categories noted above.

With respect to activities of daily living, the ALJ determined that plaintiff had only a mild restriction.  (Tr. 12). The ALJ noted that in Dr. Senger's opinion, plaintiff was "independent in basic self care, was able to perform light chores as needed, could walk for fifteen minutes, was able to use public transportation and reported that he could drive if he had a car." (Tr. 12).

With respect to social functioning, the ALJ determined that plaintiff has moderate difficulties.  (Tr. 12).  The ALJ noted, based on plaintiff's own testimony, that plaintiff "sees friends and family weekly . . . is able to go to the local store to buy cigarettes or coffee and recently attended a wake."  (Tr. 12).

16

With respect to concentration, persistence or pace, the ALJ determined that plaintiff has mild difficulties.  The ALJ noted that Dr. Senger found that "the claimant was able to comprehend, remember and carry out basic instructions and did not show any significant cognitive impairment."  (Tr. 12).  Additionally, he noted that, "On the Mini Mental Status Examination the claimant completed the testing with no errors.  He completed the Serial 7s test rapidly with good focus and made no mistakes."  (Tr. 12).

Finally, with respect to repeated episodes of decompensation, the ALJ determined that plaintiff had only experienced one to two episodes of decompensation, each of extended duration.  (Tr. 12).  The term "repeated episodes of decompensation," for the purposes of this listing, means "three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  Therefore, the ALJ's determination that one or two episodes of decompensation does not qualify as "repeated" episodes of decompensation is supported by substantial evidence.

Plaintiff alleges that the ALJ relied too heavily on the opinion of Dr. Senger and that this reliance was an error because "it is clear from the evidence that Plaintiff's overall psychological state had changed during the year following Dr. Senger's exam."  (Docket Entry # 18).  While it is true that Dr.

17

Senger's opinion was almost a year old at the time of plaintiff's hearing, there is additional medical evidence in the record, between Dr. Senger's evaluation of plaintiff in March 2008, and plaintiff's hearing in April 2009, which corroborates Dr. Senger's March 2008 opinion.

In March 2008, Dr. Davidson evaluated plaintiff and determined that plaintiff had only a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and one to two episodes of decompensation, each of extended duration.  (Tr. 259).  In July 2008, Dr. Spangler evaluated plaintiff and came to the same conclusions as Dr. Davidson in all four functional areas.  (Tr. 318).  On September 22, 2008, plaintiff consulted with Dr. Nelson who recorded that plaintiff was well groomed, his behavior was appropriate, his speech was clear, his mood was euthymic and his thought processes were logical.  (Tr. 384).  The opinions of Drs. Spangler, Davidson and Nelson support the opinion of Dr. Senger, and in turn the ultimate determination by the ALJ.

Plaintiff also alleges that at the time of the hearing plaintiff was under the care of "doctors" whose opinions greatly differed from that of Dr. Senger.  (Docket Entry # 18).  To support this allegation, plaintiff cites to the February 2009

18

letter in which Dr. Hanson and Thorman state that "Mr. Burke's symptoms have persisted now in varying degrees for nearly three years, becoming most acute in the last 10-12 months."  (Docket Entry # 18).

This court will now address whether the ALJ based his decision regarding step three on substantial evidence.  First, it appears that the only opinions on the record that do not corroborate Dr. Senger's are those of Dr. Hanson and Thorman. (Tr. 339-42).  When plaintiff refers to being "under the care of doctors whose opinions differ[] significantly from Dr. Senger," plaintiff undoubtedly refers to Dr. Hanson and Thorman.  Thorman, with whom plaintiff met on a regular basis, does not appear to be a medical doctor.[11]

Furthermore, plaintiff states that he had met with Dr. Hanson two times by the time of the hearing.  (Tr. 29).  He has had three different psychiatrists at North Suffolk:  first, Dr. Chang; second, Dr. Nelson; and third, Dr. Hanson.  (Tr. 29). Plaintiff states that doctors are "only there for short stints . . . and then move on."  (Tr. 29).  Since Dr. Nelson's last evaluation of plaintiff is dated September 22, 2008, it appears

---

[11]   Thorman, in each medical record in which he is named, is consistently referred to as Michael Thorman, M.S.  Accordingly, it does not appear that he is a medical doctor.  Plaintiff, in his testimony, refers to Thorman as his "social worker."  (Tr. 30).

that Dr. Hanson did not begin meeting with plaintiff until after that point in time.  Accordingly, at the time of the hearing, Dr. Hanson had consulted with plaintiff two times.  Curiously, exact dates for the two consultations are not known because no record of either meeting was ever provided to the ALJ.

In lieu of the aforementioned facts, the February 2009 letter signed by both Dr. Hanson and Thorman asserts that plaintiff exhibited symptoms of both recurring major depression and PTSD for three years prior to February 2009.  (Tr. 339).  The ALJ's determination that the February 2009 letter deserved less weight is supported by substantial evidence because:  (1) Dr. Hanson had only met with plaintiff for the first time a few months before writing the letter; and (2) because plaintiff's relevant medical history does not even begin until his admission to Whidden in December 2007, slightly over one year before the February 2009 letter.

Additionally, Dr. Hanson and Thorman assert that plaintiff's symptoms became "most acute over the past 10-12 months" (Tr. 339) referring to the time period leading up to February 2009.  This means that plaintiff's symptoms, according to Dr. Hanson and Thorman, became most acute beginning somewhere in the February to April 2008 timeframe.  The record as a whole, including Thorman's own notes, does support this assertion.

Based on the facts provided to the ALJ, it appears that plaintiff's recent impairment began with his hospitalization in December of 2007.  This catalyzing event also seems to be the most acute manifestation of plaintiff's symptoms on record. Plaintiff was released from the hospital, upon his own request, in an improved condition just a few days after being hospitalized (Tr. 206) and began counseling through North Suffolk shortly thereafter.  (Tr. 29-30).  Plaintiff was evaluated by Dr. Senger in March 2009, by Dr. Spangler in July 2009 and by Dr. Nelson in September 2009, after which point the record is silent.  (Tr. 385).  None of the evidence in any evaluation over this time period suggests that plaintiff's condition had become more acute than it was in December 2007.  Moreover, Thorman's own notes over this time period evidence that plaintiff's condition remained relatively consistent.  (Tr. 360-72).

Given the totality of the medical evidence available, this court finds that the ALJ did have good reason to assign more weight to Dr. Senger's opinion, which was supported by the opinions of Drs. Davidson, Spangler and Nelson, and less weight to the opinions of Dr. Hanson and Thorman.  Dr. Senger's opinion, supported by the opinions of Drs. Davidson, Spangler and Nelson, thereby provided substantial evidence for the ALJ to determine that plaintiff did not satisfy the paragraph B criteria at step

three of the analysis.  Accordingly, the ALJ was justified in continuing to step four.

With respect to step four, the ALJ determined that plaintiff did have the RFC to perform past work; specifically, that of a janitor.  (Tr. 15).  In making this determination, the ALJ gave "careful consideration to the medical opinions expressed by the medical sources of record, in accordance with SSR 96-2p and 96-6p."  (Tr. 14).

These medical opinions expressed the following.  In March 2008, Dr. Senger found that plaintiff reported basic self-care, could do light chores as needed and could "walk fifteen minutes and lift fifty pounds."  (Tr. 247).  Plaintiff visited friends on a weekly basis, could take public transportation and reported he could drive a car if he had one.  (Tr. 247).  Plaintiff also scored perfectly on a mini mental status exam (30 of 30 correct). (Tr. 247).  Finally, Dr. Senger noted that plaintiff was able to comprehend, remember and carry out basic instructions, was able to relate to Dr. Senger well, and showed no signs of cognitive impairment.  (Tr. 247).

Also in March 2008, Dr. Davidson conducted an RFC assessment of plaintiff.  (Tr. 263-66).  Dr. Davidson's Functional Capacity

Assessment of plaintiff (part three of the RFC assessment), with

respect to the four broader RFC categories[12] is as follows:

> A)[Understanding and Memory:]  No cognitive impairment;
> B)[Sustained Concentration and Persistence:]  No impairment;
> C)[Social Interaction:]  Plaintiff would have difficulty
> dealing with the public and with critical supervision but
> could otherwise function in an unpressured situation;
> D)[Adaptation:]  Plaintiff would do best in a consistent
> setting.

(Tr. 265).

In July 2008, Dr. Spangler made another RFC evaluation of

plaintiff.  (Tr. 304-07).  Dr. Spangler's Functional Capacity

Assessment of plaintiff, again with respect to the four broader

RFC categories, is quite similar to that of Dr. Davidson's.  It

is as follows:  "A)[Understanding and Memory:]  No limitations;

B)[Sustained Concentration and Persistence:]  Able to focus and

persist at simple tasks for 2 hrs. in an 8 hr. day; C)[Social

Interaction:]  Relates adequately in simple social situations;

D)[Adaptation:]  No limitations[.]"  (Tr. 306).

Additionally, in July 2008, Thorman met with plaintiff twice

and Thorman's recorded notes do not reveal symptoms that differ

much from plaintiff's previous assessments.  Thorman notes on

July 11, 2008, that plaintiff was on "a little high" as his son

was home and he had just won $3,800 on horse racing at the

---

[12]  The four broader RFC categories are:  (1) Understanding
and Memory; (2) Sustained Concentration and Persistence; (3)
Social Interaction; and (4) Adaptation.

Belmont Stakes.  (Tr. 370).  On July 25, 2008, plaintiff asserted that he had been experiencing "basically the same thing."  (Tr. 370).  He seemed "mildly anxious" and had somewhat diminished desire but felt "pretty good all-in-all."  (Tr. 370). Furthermore, the last medical record available to the ALJ, aside from the February 2009 letter from Dr. Hanson and Thorman, is Dr. Nelson's evaluation of plaintiff on September 22, 2008.  (Tr. 384).  Dr. Nelson found that plaintiff was well groomed, behaved appropriately, spoke clearly and had logical thought processes with a euthymic mood.  (Tr. 384).

At plaintiff's hearing, a vocational expert testified that a person who could understand and remember simple and complex instructions, concentrate for two hour periods over an eight hour day, interact appropriately with co-workers and supervisors, and adapt to changes in the work setting, could perform the work of a janitor, which is medium, unskilled work.  (Tr. 37).  Addressing the first two prongs that the vocational expert discussed, Drs. Senger, Davidson and Spangler found plaintiff to have no limitation remembering and carrying out basic instructions, nor did they find that plaintiff would have an issue concentrating for two hour periods over an eight hour day.  (Tr. 243, 263-64, & 306).  Addressing the third prong, Dr. Senger and Dr. Davidson opined that plaintiff would have no problem interacting

appropriately with co-workers and supervisors (Tr. 243 & 264),
and Dr. Spangler opined that plaintiff "[r]elates adequately in
simple social situations." (Tr. 306). Finally, addressing the
fourth prong, Dr. Spangler found that plaintiff had no adaptive
limitation (Tr. 306) and Dr. Senger found that plaintiff could
use public transportation, make plans to visit friends and had no
significant cognitive impairment. (Tr. 306 & 243).
Additionally, Dr. Davidson's only comment was that plaintiff
would "do best in a consistent setting" (Tr. 265) which the
position of janitor could provide.

The only evidence in the record that might suggest a
conclusion opposite the ALJ's conclusion is the February 2009
letter from Dr. Hanson and Thorman. (Tr. 339). The February
2009 letter is unsubstantiated. Nothing in the record up until
September 22, 2008, suggests that plaintiff's condition was
deteriorating and there is nothing in the record after that date.
(Tr. 385). Additionally, the RFC assessment that Dr. Hanson
submitted with the letter is incomplete. (Tr. 340-42). Although
Dr. Hanson filled out the first section of the assessment
concerning the mental activities checkboxes and was not required
to fill out the second section, he left blank the third section
of the assessment. (Tr. 342). This third section is the section
that calls for a narrative description of a claimant's

impairments.  Based on this lack of evidence, the ALJ appropriately assigned little weight to the February 2009 letter of Dr. Hanson and Thorman.

Given the information in the record and that which was before the ALJ, substantial evidence existed to support the ALJ's determination at step four that plaintiff could perform past relevant work as a janitor.  As a result, the ALJ's ultimate determination that plaintiff is not disabled for purposes of SSDI or SSI was supported by substantial evidence.  Accordingly, the ALJ's determination should be upheld.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[13] that the Commissioner's motion to affirm the decision of the ALJ (Docket Entry # 19) be **ALLOWED.**


                              /s/ Marianne B. Bowler
                              **Marianne B. Bowler**
                              United States Magistrate Judge

---

[13]   Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of the Report and Recommendation to which objection is made and accompanied by the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  See Rule 72, Fed. R. Civ. P.